And at this time we'll hear Sea Trade Maritime versus Stelios Koutsoudantis. Good morning. Good morning. May it please the court. My name is Nader. Oh, sorry. Oh, I'm sorry. Oh, I didn't see the premises hadn't been vacated. Good morning. Good morning again. May it please the court. My name is Nader Mubarga from the firm Bays Liston and Mubarga, and I represent the appellants in this case. This is an appeal from a bench trial decision in which there were two claims at issue, unlawful arrest of a ship and breach of fiduciary duty. The court actually held in favor of the appellants and found that the defendant, an appellee, had breached his fiduciary duty, and the remedy was for defendant to forfeit his shares in the company Sea Trade. We are here because we are appealing three aspects of that remedy. First, the court found that the appellant had acted with unclean hands, and that had the effect of changing the date of the forfeiture of the shares from the date of the breach or just complete forfeiture of the shares with no date to the date of the decision. This had the result of conferring all the benefits of the shareholder status before and after the breach to the defendant. We'll start with that aspect of the appeal for now. Basically, the entire unclean hands argument can be summed up by the court, by the plaintiff's failure to follow a few corporate formalities. One was after a Greek decision in 2009 found the defendant was a shareholder, a lower court decision, that after that date, 2009, plaintiff failed to call a shareholder meeting, failed to elect directors, and failed to provide access to books and records to the defendant who is now a named shareholder in the company. And whom you're saying owed you a fiduciary duty. Yes. He owed you a fiduciary duty as a shareholder. Yes, he did. And the court found that we owed him a fiduciary duty as a shareholder. But the aspect of unclean hands has three elements. It's very straightforward. Immoral and unconscionable conduct by the plaintiff had to be proved. Intent and willfulness by the plaintiff, and plaintiff's conduct had to cause injury to the defendant. Well, to ask the intent and willfulness, I mean, Mr. Peters said he wouldn't recognize Mr. Koutsoudantis' participation in the company the longest day he lived. Well, that was said in the context of a, it's difficult to understand that without understanding that the case that was brought, and the case that Mr. Peters was testifying, was about Mr. Koutsoudantis forfeiting his shares. So in that trial, he was not going to say that he, a defendant should keep his shares. But if you look at the escrow agreement that was signed by the parties in 2009, around the time of the lower court Greek decision, that escrow agreement is basically, shows that plaintiff would recognize defendant as a shareholder ultimately. Basically under that agreement, the plaintiffs and the defendant, the plaintiff and the defendant realized that this was a highly charged issue in Greece. It dealt with the interplay between a restriction in the corporate bylaws to transfer shares to someone else, and that shareholder's right to bequeath her shares to whomever she chooses. That issue went up to the Greek Supreme Court. The parties recognized that no matter what happened, that either party, whether the party lost or won, that that case would be appealed by the losing party. So they entered into an escrow agreement in 2009 that said that basically they would distribute the funds, whatever was left in the operating company, which was basically $2.3 million, which is now $2.6 million. At the time of the escrow agreement, there was no ship, there was no charter, and there was no business. Money was just the proceeds of the sale of the ship for scrap. Exactly, Your Honor. And so basically they agreed, we're going to keep this money in escrow. Let's litigate this issue. And then once we litigate it and the language of the agreement says a final non-appealable judgment has been issued on Koutsoudantas' shares and his entitlement to the proceeds, if any, then we'll distribute. I think you can assume we've read the facts in the case. I want to take you back to, you're challenging the finding of unclean hands because that somehow affects how much the defendant is penalized for his breach of fiduciary duty, right? Yes, Your Honor. Okay. Now, you're in Greece litigating that he doesn't own anything in this company. You lose after almost a decade of litigation in the Greek courts, and so you take the position now that, okay, he owns the shares, he owed us a fiduciary duty. And the breach of fiduciary duty, as I understand it, is he had the ship arrested. Yes, Your Honor. Okay, stay with me. The court on the false arrest claim found that damages to you for that action are speculative. Well, if they're speculative on the false arrest claim, how are they not speculative on the breach of fiduciary duty claim? I mean, what you want here is you want the man to lose all his shares in this company before distribution of the money so that, in essence, you get what you couldn't get in the Greek courts. My question to you is, if there was no cognizable injury for wrongful arrest, how is there cognizable injury for breach of fiduciary duty? Well, the cognizable injury for unlawful arrest was damages from the loss of the ability to sell the ship in 2008. So that was, there was a height of the market. Now tell me how you've got measurable damages for breach of fiduciary duty. Well, the breach of fiduciary duty— Or at least how it would warrant depriving him of any interest in this company after all this litigation in Greece said he did have an interest. Well, the remedy for breach of fiduciary duty was forfeiture of shares. Why? It doesn't have to be. This is an equitable remedy. How is that equitable in a circumstance where the court says, well, there's no measurable amount of damages? The damages that actually occurred, putting aside the fact that Mr. Seatrade and Peters couldn't sell the ship because it was unlawfully arrested from port to port, the damage occurred was that Mr. Koutsidontis actually destroyed the company because of that arrest campaign during the summer of 2008. There's a fair amount of blame to go around on that one. Well, Your Honor, for the arrest campaign, it started in July. Mr. Koutsidontis—and this goes to some of our—the remedy that we're seeking for compensatory damages. It was a hot market. It was liquid. Mr. Peters— The court finds that that's speculative. If that's correct, how is forfeiture of all the shares, which is what you want, an equitable remedy for the breach of fiduciary duty? Well, the damages from the sale of the ship were speculative, but the damages of whatever is included in the operating agreement as of now, which is $2.6 million, is not speculative. That's actual money. So if you forfeit the shares from the time of the breach, which I believe, at the very least, is warranted—if you find somebody who breaches fiduciary duty and you order a forfeiture of shares, then that forfeiture should at least be at the time of the breach. Now, because there happened to be money in the company after the breach—say, $2.6 million in this case—doesn't mean that it's unfair. What's unfair is that he breaches fiduciary duty, he should have a penalty. And even if he doesn't get the—have to pay the difference between what the ship was sold for and what it could have been sold for at the height of the market, at the very least, he should give up the proceeds from the ship that was sold and has $2.3 million in the account. That is not speculative. That money is sitting there. Now, the part that is speculative that the Court found was, was SeaTrade—how far in the sale process was SeaTrade in that 2008 summer? Were they far enough along that they was a reasonable certainty that the ship would be sold? Or was it more at the beginning stages? Don't we have fact-finding on this? The Court was not convinced that the thing was sufficiently matured to assume that there would have been a sale. Yes, Your Honor. That's the third aspect of our appeal, which was the damages issue. And I do agree that that— No, there was this imminent sale, and that the decline in the market in September of 2008 impacted things. But that's contrary to what the findings are. The findings, I say, the Court didn't consider—if you take steps one, two, and three in selling a ship, and your ship is arrested for months on end, and you cannot take steps four, five, and six, then I would say, yes, the ship couldn't be sold because of the actions of the defendant. And I understand that— You have reserved three minutes for rebuttal. Thank you. And we will hear your answer. Thank you very much. Good morning, Your Honors. Mark A. Berman on behalf of the defendant, Stelios Koutsoudantos. So the appellants describe this case in their brief as a blood feud, and I think actually that's a fair characterization. The district court sat for three days and heard testimony about that blood feud. She heard from the two protagonists, the plaintiff and my client, Captain Koutsoudantos. She was able to assess their credibility and the history of their relationship, and the history of the litigation between the parties, and in particular, from my client's perspective, the history and the time that had passed during which the plaintiff had completely denied my client—or failed to recognize my client as a shareholder of C-Trade. Wasn't the determination of the court of first instance in Greece on appeal during that period of time? It was being appealed. Ultimately—and I should say that the district court took that into consideration in her opinion that it was on appeal—the fact is it was affirmed at the first level appeal. It was affirmed by the Greek Supreme Court, and even after that happened, nothing in the plaintiff's behavior changed vis-à-vis his treatment of Mr. Koutsoudantos. In fact, at trial, part of the testimony was—his cross-examination was—to this very day, that day that he testified, he denies that Captain Koutsoudantos had inherited an interest in this company. And taking all of those factors into consideration, the district court appropriately and correctly applied general principles that apply to the court's equity jurisdiction, and the court's power in where the relief that's requested is equitable in nature, to mold the relief to fairly adjudicate the interests of the parties, given all of the—and I think the language from the case is all of the exigencies and all of the circumstances—and to put a final end to the party's dispute. And that's what the judge did. The district court did that on the basis of unclean hands, right, and said then, therefore, you're not entitled to any relief. So what the district court did with— Not that molding. Right. So with respect to the unclean hands, what the court said was that rather than making the forfeiture effective as of the date of the arrest of the ship in Spain, she was going to make—the court made the forfeiture effective as of the date of her judgment. Now as an aside, what that court's talking about equitable relief actually say is that that—that the equitable relief imposed by the—or crafted by the district court should be based on the circumstances as of the date of judgment. So query whether that was even necessary to do that. But nevertheless, with respect to moving the only aspect of the unclean hands that the court took into—I'm speaking over myself. The district court took into consideration the unclean hands in moving the date of forfeiture, and the court explained why it thought that was appropriate in the context of doing fairness to the parties, which again was consistent with the court's equitable powers and the court's obligation to do justice. Is there a difference, or would there be a difference in equity if the immorality, which needs to be determined to be a part of the acts of the miscreant, if the immorality actually didn't occur until after the Greek Supreme Court's decision that confirmed the shares actually belonged to your client? The answer is I don't think it makes a difference. Why? Because looking at the courts that discuss a trial court's equitable powers, as I just mentioned, the focus is on what is the situation as of the date of the court's judgment, and how do we make sure that there is equity between the parties. And it's clear from the district court's decision in this case that what informed her decision is the fact that this dispute between the parties had been pending for, as of now, 15 years, and I guess 13 years at the time of trial. During that time, so— Dickens wrote about that, you know. I wish I did. I've forgotten my Dickens. But—and during that time period, the evidence of trial was that there was a remarkably profitable market for bulk container ships, which epically And during all that time, all the profits from C-Trade went into the plaintiff's pocket. He never shared—and by the way, even after the Greek Supreme Court at the trial level, the appellate level, or the Supreme Court level, Mr. Peters didn't come to Captain Koutsoudantas and say, hey, I was wrong. You're a shareholder. Let's figure out your share of the profits going back to 2003. He didn't do that. If they had these shareholder meetings, what would they talk about? Exactly—well, at that point, exactly what I just said, which is we need to make you whole for the fact that I've been pocketing all these profits for the past 13 years as of trial, 15 years as of today, and we need to acknowledge the fact that you were a shareholder and I've deprived you of all the benefits of being a shareholder for the past 13 to 15 years. That's one thing they absolutely could have discussed. Once the ship was sold, which was the only asset, and the proceeds were secured, what business was going on? What kind of meeting would Mr. Koutsoudantas like to attend? To talk about what? So again, at the very least, the division of the assets, the monies that are in escrow. Now there's an escrow agreement, but there's nothing that prevents Mr. Peters by saying I was wrong, you were a shareholder, you should have at least half of the escrow proceeds and perhaps more since I've pocketed all this money over the past 13 years. Well, that's not usually how blood feuds end. No, no, but Your Honor's asking me a good question, which is what would have taken place at this corporate shareholder meeting? I've sat on boards. That's often discussed. How do we deal with money in the corporate bank account? That would be a shareholder meeting that would be essentially the same as a settlement meeting in a litigation. There was no ongoing business of the corporation. There was money in escrow. I suppose they could have decided to take the money out of escrow and invest it in another ship or in something else, I suppose. So I guess that depends how one thinks about the business of the corporation. If all the $2.6 million, then deciding what to do with that $2.6 million is corporate business. It's not personal business. It's corporate business. That's something that shareholders would need to decide. There certainly also wasn't going to be any future business in the absence of a possible shareholder. So there was never the opportunity to discuss whether there was the ability to proceed further with this business, right? That's a fair— But there certainly wasn't going to be any discussion if there were no meetings. That's for sure. That's for sure. I understand what Your Honor is saying. It's almost a difficult question to answer because Mr. Peters didn't take that step, which is what the district court was focused on. There's nothing that the plaintiff, the appellant, can point to to say, well, I accepted the judgment of the court and I took this step to try to make things right. They still aren't making things right. You didn't cross-appeal from the district court's decision that your own breach of fiduciary duty should have cost you the shares, right? We filed a notice of cross-appeal and then we dropped it. Yeah, okay. Unless the court has any— Can I just ask a question? I don't want to hear anything about the process, but I just want to know, did you folks go through the court mediation process in this case? Not— We called camp. I'm sorry, through the Second Circuits? I don't believe we did. Thank you. Thank you. We'll hear rebuttal. Thank you, Your Honor. Mr. Berman was talking that nothing changed after 2009. He completely ignores the language of the escrow agreement. It specifically laid out what the parties were supposed to do. Wait. There was no talk of shareholder meetings or electing directors. There was not even any—Mr. Kucinich didn't reach out to Mr. Peters and say, listen, I want a shareholder meeting. Let's talk about my profits beforehand. That would be in the context of a settlement. And if Mr. Peters continuously resisted, then maybe this conversation about unclean hands would be a different story. Regarding the elements— It was your position, just so I understand it, that absent some process laid out in the case, how the parties were to conduct themselves with each other, whatever Mr. Peters did doesn't count towards clean hands? Did or did not do? Well, Mr. Peters didn't do anything. He just continued to litigate his claim against Mr. Kutudantas for breach of fiduciary duty. And I just—as frankly, there was no dividends paid for 2003 to 2008. I know Mr. Kutudantas takes issue with that, but the company was losing money from all this litigation. That was an issue. None of that was brought up by Mr. Kutudantas to a point where Mr. Peters resisted him. And then, even though the court's equitable powers are broad on some level, they're not unlimited. There are elements here to be met. Injury is one of them, and this court has reiterated that in two of its decisions. The district court said the injury was requiring Mr. Kutudantas to litigate his inheritance of his shares throughout the Greek appellate courts. That can't be possibly a one-in-two litigant, and every litigation would be guilty of unclean hands. And secondly, the parties agreed to litigate through the appellate courts. So I'm a little bit unclear why that's an injury. And frankly, regarding the profits from 2003 to 2008, that brings me back just briefly to the inquest. What we have here and what the district court was talking about in its decision was, look, there's $2.3 million in the—or $2.6 million at this point in the escrow agreement. How are we going to divide this up? But what—that happened was it turned into an inquest in which Mr. Kutudantas filed a claim for $19 million against Mr. Peters. There's no chance for us, no opportunity for us in this inquest to cross-examine the witness report, witness his findings or anything else. And Mr. Kutudantas had filed an identical state claim in 2012 for books and records, which turned into a plenary action in 2016 litigating these claims. Breach of fiduciary duty, conversion, dissolution, fraud. These are claims with elements. These are claims that require due process. This is the bedrock of our litigation system is when you want to take $19 million and accuse someone of stealing $19 million, you have to actually prove that they took the money. But what we have here is a convoluted system right now is we have a state action going on with five claims, and then the judge ordered an inquest. Mr. Kutudantas didn't disclose to the district court that he had filed a state claim, most likely because he didn't think that it was necessary. What's the status of that? We have briefed a motion to dismiss on statute of limitations grounds and failure to state a cause of action because as some claims, such as fraud, there are a number of elements. That case is in abeyance right now, which is basically it's been stayed pending this court reverses the inquest, then we can go forward in state court. And I don't think it's going to be that much of a litigation. I think it's really about reverse to order. Yes. Yes. Don't reverse the order, ordering the inquest. Then what happens in state court? Well, I don't, I am actually, I'm not really sure. I, I, Mr. Kutudantas hasn't affirmatively said he's going to drop the claims court. Yes. New York County judge is before judge crane right now. And that's something that, yes. Thank you very much. Thank you both. We'll reserve decision.